J-A04035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TARA MARIE BURDETTE, | |
| Appellant | No. 1557 EDA 2016 |

Appeal from the Judgment of Sentence April 22, 2016
in the Court of Common Pleas of Chester County
Criminal Division at No.: CP-15-CR-0000068-2016

BEFORE:  SHOGAN, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED APRIL 11, 2017**

Appellant, Tara Marie Burdette, appeals from the judgment of sentence imposed after her bench conviction of one count of possession of drug paraphernalia, 35 P.S. § 780-113(a)(32).  Specifically, she challenges the court's April 14, 2016 order denying her motion to suppress evidence obtained as the result of an investigative detention.  We reverse the order, vacate the judgment of sentence, and remand.

We take the following facts from the trial court's April 14, 2016 order, and our independent review of the certified record.

> On October 23, 2015[,] the Tredyffrin Township Police received a report of a suspicious vehicle in the area of Brookmeade Road and Valley Forge Road in that township.  A

---

[*] Retired Senior Judge assigned to the Superior Court.

concerned citizen informed police that a white Toyota Camry, unfamiliar to the caller and occupied by three individuals, drove slowly past a residence in that neighborhood and then parked on a nearby street[]corner.  When the contents of the call were dispatched on police radio at approximately 3:39 p.m., Officer Neil Jackson of the Tredyffrin Township Police Department responded to the dispatch and headed towards the area to investigate.  While stopped at a traffic light *en route*, Officer Jackson observed a white Toyota Camry in the opposite lane. . . .  Although he observed no violations of the [] Vehicle Code,[1] he chose to initiate a traffic stop at approximately 3:43 p.m. for the purposes of investigating the report of a suspicious vehicle. [Appellant] was a passenger in that vehicle, and her arrest arose out of the circumstances of the stop.

(Trial Court Opinion, 4/14/16, at unnumbered pages 1-2 n.1).

The Commonwealth filed an information on January 22, 2016, charging Appellant with one count of possession of drug paraphernalia.  On March 3, 2016, Appellant filed a motion to suppress evidence seized as a result of the investigative stop, on the basis that Officer Jackson lacked reasonable suspicion that the occupants of the vehicle were engaged in criminal activity. (*See* Motion for Suppression of Evidence, 3/03/16, at 1-2).

The trial court denied Appellant's motion on April 14, 2016.  On April 22, 2016, based on the denial of the suppression motion, the parties stipulated to the facts and the court convicted Appellant of possession of drug paraphernalia.  The same day, the court sentenced her to one year of

_____

[1] 75 Pa.C.S.A. §§ 3101-3817.

probation, and ordered her to undergo drug and alcohol evaluation and to follow any recommended treatment. Appellant timely appealed.[2]

Appellant raises one issue for this Court's review: "Did the trial court err in denying [her] motion for suppression of physical evidence and or statements?" (Appellant's Brief, at 2).

Our standard of review of this matter is well-settled:

> In reviewing a suppression ruling, we are bound by the suppression court's factual findings, unless they are without support in the record. We may reverse the legal conclusions reached by the suppression court, however, if they are in error. Thus, our standard of review of the legal conclusions reached by the suppression court is *de novo.* Where, as here, the defendant is appealing the ruling of the suppression court, we consider only the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the [suppression] record.
>
> It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony. This Court's scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

*Commonwealth v. Roche*, 2017 WL 34931, at *4 (Pa. Super. filed Jan. 4, 2017) (citations and quotation marks omitted).

> An investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. Such a detention

---

[2] On July 15, 2016, Appellant filed a timely concise statement of errors complained of on appeal, pursuant to the court's order. The court filed an opinion on July 18, 2016, in which it relied on the reasons stated in its April 14, 2016 order denying the motion to suppress. *See* Pa.R.A.P. 1925.

- 3 -

constitutes a seizure of a person and thus activates the protections of the Fourth Amendment and the requirements of **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

\* \* \*

The appellate courts have mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. To meet this standard, the officer must point to specific and articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion. In ascertaining the existence of reasonable suspicion, we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot.

To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including tips from citizens. . . .

**Commonwealth v. Barber**, 889 A.2d 587, 592-93 (Pa. Super. 2005) (quotation marks and most citations omitted).

In this case, at the hearing on the motion to suppress, Officer Jackson testified that Tredyffrin Township is "very wealthy[,]" and that a lot of the homes there, including "multiple" in the neighborhood in question, had been subject to burglaries. (N.T. Hearing, 3/17/16, at 10-11). He stated that some of the burglaries were perpetrated during the day, with individuals casing the houses to determine if the residents were home, before breaking into them. (**See id.** at 11).

On the day of the incident, Officer Jackson responded to a radio dispatch about an unfamiliar white Toyota Camry with three occupants,

- 4 -

which drove very slowly down the street, before stopping at the corner of Brookmeade and Valley Forge Roads. (*See id.* at 14). On his way to the scene, the officer was travelling north on Route 202, when he observed a white "older model" Toyota Camry driving southbound on Route 202. (*Id.* at 19). After observing the car, Officer Jackson called in to dispatch and asked if the complainant could still see the Toyota Camry parked in her neighborhood. (*See id.*). The complainant said the car had left, travelling southbound on 202. (*See id.*).

Officer Jackson "did not see any traffic violation based on the totality of the circumstances of the entire incident[.]" (*Id.* at 22). However, he turned his vehicle around to get behind the Camry, and initiated a stop "to establish [why the occupants] were back there in that residential neighborhood because there is no reason for you to be back there unless you live there. . . . It makes no sense to cut through that neighborhood to cut off five minutes of your time." (*Id.* at 22-23). On cross-examination, Officer Jackson admitted that the Camry was not involved in any criminal activity, and that there were several legitimate reasons to be in the subject neighborhood, even if not a resident. (*See id.* at 27-29). However, he explained that, if he had not stopped the Camry, he possibly would have lost the opportunity to identify a burglary suspect. (*See id.* at 30).

We are constrained to conclude that the above facts do not establish reasonable suspicion. The decisions in *Commonwealth v. DeWitt*, 608

A.2d 1030 (Pa. 1992), and **Commonwealth v. McClease**, 750 A.2d 320 (Pa. Super. 2000), provide guidance to our disposition. In **DeWitt**:

> . . . On May 13, 1989, at approximately 11:50 p.m., while on routine patrol in South Manheim Township, State Troopers Reichert and Hartzel observed an automobile parked partially on the berm of the road and partially in the parking lot of St. Paul's Church. The vehicle was faced in the opposite direction of travel. The vehicle's interior lights were illuminated but the exterior lights were not. Trooper Reichert testified that he was concerned because he thought that the vehicle might be disabled, and also because he had received notice from St. Paul's Church to check for suspicious vehicles. Trooper Reichert testified that in order to investigate, he pulled alongside the vehicle, whereupon the interior lights were extinguished and the four occupants made furtive movements and suspicious movements as if they were trying to hide something. The vehicle then began to pull away from the scene. At that point, Trooper Reichert became suspicious of criminal activity and stopped the vehicle.

**DeWitt**, **supra** at 1031-32 (quotation marks and record citation omitted). Based on the above facts, the trial court granted Appellant's motion to suppress, and the Commonwealth appealed. A panel of this Court reversed the trial court, finding that, "[t]he combination of furtive movements, time of night, previous notice from the property owner, potential parking violation, and attempted movement from the scene when the police arrived, sufficiently justified the legality of the stop." **Id.** at 1034 (record citation omitted). However, our Supreme Court concluded that this was error, observing:

> We find [the Superior Court's] conclusion unsupported by the record. Although the police had previous notice from the property owner of criminal behavior in the church parking lot,[a]

- 6 -

there was absolutely no evidence that the vehicle in question was engaged in the type of activity complained of. . . .

> [a] Trooper Reichert testified that the police had received notice from St. Paul's Church to check for suspicious vehicles, *i.e.*, kids, underage drinking, laying rubber, doing donuts in the parking lot and [things of] that nature.

We hold, therefore, that the police did not have . . . reasonable suspicion of criminal conduct to justify the stop made in the instant case[.] . . .

*Id.* (quotation marks and record citation omitted).

Similarly, in *McClease*, *supra*:

. . . On October 24, 1998, shortly after midnight, Detective Randy Morris and Officer Joseph Moors of the Bristol Borough Police Department drove their police cruiser down Spruce Street, a residential street within their jurisdiction. The car, although unmarked, was readily identifiable as a police cruiser. Spruce Street is a narrow one-way street with parking on both sides and a narrow travel lane down the middle. As the officers drove down Spruce Street, they observed McClease sitting alone in his vehicle. McClease's vehicle was legally parked under a railroad overpass. The overpass causes this part of Spruce Street to be darker than other parts of the street. The police had received complaints about ongoing illegal activities around this part of Spruce Street including persons drinking alcohol in public, persons possessing and displaying weapons, and persons involved in drug transactions.

McClease's vehicle was parked on the left side of the road. Detective Morris, who was driving, noticed that McClease's head was lowered as if he was looking at his hands. As the police vehicle passed McClease's vehicle, McClease raised his head and looked at Detective Morris. As McClease did so, his eyebrows raised, his eyes got wider, and he immediately lowered his body. Upon observing these movements, Detective Morris stopped the police cruiser and backed it up until it was abreast with McClease's vehicle. Detective Morris and Officer Moors exited their vehicle and approached McClease's vehicle.

* * *

> Upon further approaching the vehicle, Detective Morris noticed an open container of alcohol in the vehicle and the blunt on the street below the driver's door. Detective Morris then ordered McClease out of the vehicle so that Detective Morris could pat McClease down. McClease complied. . . .

**McClease**, **supra** at 322-23.

Applying **DeWitt** to the above facts, this Court concluded that: "the specific and articulable facts observed by Detective Morris and Officer Moors, and any rational inferences drawn therefrom, are insufficient for us to conclude that the officers possessed the requisite reasonable suspicion that McClease was currently engaged in criminal activity. Consequently, the stop of McClease was illegal." **Id.** at 326.

Likewise, here, based on the binding caselaw of our Supreme Court, we must conclude that Officer Jackson lacked reasonable suspicion to conduct an investigatory detention. The only activity that the complainant reported was that, in the middle of the afternoon, a car she did not recognize slowly drove by her home in a wealthy residential neighborhood and parked at the corner for a few moments. The vehicle then left the location of its own accord, and moments later, when Officer Jackson observed the car, he did not see any Vehicle Code violations. Finally, when the officer initiated a traffic stop, the occupants immediately cooperated and made no attempt to flee.

We recognize that multiple burglaries had occurred in the neighborhood in which the subject vehicle initially was observed. However, to assume that passengers of a vehicle who were briefly stopped in a wealthy residential neighborhood might be planning to burglarize a home at some future time, or had done so previously, merely because burglary is a common crime in the area, requires a degree of speculation that cannot sustain reasonable suspicion. *See DeWitt*, *supra* at 1034; *McClease*, *supra* at 326. In short, "there was absolutely no evidence that the vehicle in question was engaged in the type of activity complained of." *DeWitt*, *supra* at 1034; *see also Commonwealth v. Reppert*, 814 A.2d 1196, 1204 (Pa. Super. 2002) ("Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, . . . [Our] inquiry will not be satisfied by an officer's hunch or unparticularized suspicion.) (emphasis and citation omitted); *Commonwealth v. Donaldson*, 786 A.2d 279, 284 (Pa. Super. 2001), *appeal denied*, 800 A.2d 931 (Pa. 2002) (police officer's observation of individual entering and exiting defendant's vehicle in area known for drug dealing might have been "fishy" or have created an "educated hunch" of illegal activity, but this did not equate to reasonable suspicion justifying investigative detention); *McClease*, *supra* at 326 (stop illegal where police lacked reasonable suspicion that defendant "was currently engaged in criminal activity").

Therefore, under the facts presented in this case, we are constrained to conclude that the trial court erred in finding that Officer Jackson had reasonable suspicion to effectuate a traffic stop, and in denying Appellant's motion to suppress any resulting evidence. Hence, we reverse the trial court's April 14, 2016 order, and, because the parties stipulated to the facts of this case based on the trial court's improper denial of the motion to suppress, we vacate the judgment of sentence and remand for proceedings consistent with this decision.

Order reversed. Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2017